UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Natural Resources Defense Council<br>1200 New York Avenue, NW, Suite 400<br>Washington, DC  20005<br>(202) 289-6868, | ) <br>) <br>) <br>) <br>) <br>) |
| The Wilderness Society<br>1615 M Street, NW<br>Washington, DC  20036<br>(202) 833-2300, | ) <br>) <br>) <br>) <br>) |
| Biodiversity Conservation Alliance<br>P.O. Box 1512<br>Laramie, WY  82073<br>(307) 742-7978 | ) <br>) <br>) <br>) <br>) |
| Wyoming Outdoor Council<br>262 Lincoln<br>Lander, WY  82520<br>(307) 332-7031 | ) <br>) <br>) <br>) <br>) |
| Wyoming Wilderness Association<br>P.O. Box 6588<br>Sheridan, WY  82801<br>(307) 672-2751 | )   Civ. Case No.<br>) <br>) <br>) <br>) <br>) |
| Plaintiffs, | ) <br>) |
| v. | ) <br>) |
| United States Bureau of Land Management,<br>1849 C Street, NW<br>Washington, DC  20240<br>(202) 208-3801, | ) <br>) <br>) <br>) <br>) |
| Ken Salazar, in his official capacity<br>as Secretary of the Interior<br>Department of the Interior<br>1849 C Street, NW<br>Washington, DC  20240 | ) <br>) <br>) <br>) <br>) |

(202) 208-3100,                                    )
                                                   )
                        Defendants.                )
_____)

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      This suit challenges the decision by the U.S. Bureau of Land Management

(BLM) to authorize oil and gas development on over 3 million acres of some of Wyoming's

spectacular landscapes pursuant to the Rawlins Resource Management Plan (RMP).  The

land opened to oil and gas development includes the colorful buttes, cliffs, and canyons of

Wyoming's Red Desert as well as the sagebrush habitat that is home to important wildlife

species such as elk, pronghorn antelope, and sage-grouse.  The Red Desert contains prized

wilderness quality lands, such as Adobe Town, an area designated "Very Rare or

Uncommon" by the State of Wyoming.  The Red Desert's Powder Rim provides a critical

connection for wildlife from Adobe Town to the Medicine Bow National Forest to the east.

Golden eagles soar above its sandrock rim.  The lands covered by the Rawlins plan are also

home to numerous historical and cultural resources including the Overland Trail, the

Cherokee Trail, and the Outlaw Trail.  In approving the challenged plan, BLM failed to

adequately protect the wilderness characteristics, air quality, and properly evaluate the effects

of the plan on climate change.

2.      Increased oil and gas drilling in Wyoming has led to violations of the federal

air quality standard for ozone in some areas of the state.  In 2008, as the Rawlins RMP was

being drafted, Sublette County, where the BLM Pinedale Field Office is located, recorded 8-

hour ozone levels of 122 parts per billion (ppb) – close to double the existing standard of 75

ppb.

3.      As a result, Wyoming state officials have requested that the U.S.

Environmental Protection Agency designate parts of the state as non-attainment for ozone.

In the technical report supporting the State's request to designate Sublette and portions of

Lincoln and Sweetwater Counties in non-attainment, the State declared, "[t]he analysis

conclusively shows that elevated ozone at the Boulder monitor is primarily due to local emissions

from oil and gas (O&G) development activities: drilling, production, storage, transport, and

treating." Yet, BLM failed to model the impacts on ozone pollution of the 8,822 new wells

and 3,158 miles of new roads planned for in the Rawlins RMP.

4.      Of the 18.4 million surface acres of land managed by BLM in Wyoming,

citizens have identified 1.1 million acres for designation as wilderness. In the Rawlins RMP,

BLM refused to withdraw roughly 223,000 acres of citizen-proposed wilderness lands from

oil and gas drilling.

5.      BLM has now moved forward to lease parcels in wilderness quality lands for

oil and gas drilling. The agency announced its intention to sell seven parcels in wilderness

lands at its lease sale scheduled for Tuesday, May 11, 2010.

6.      In addition, BLM has approved over fifty drilling permits pursuant to the

Rawlins RMP. Five of these permits are for wells located within the citizen proposed

wilderness in the Adobe Town. If allowed to proceed, oil and gas development will degrade

the landscape with well pads, roads, pipelines, and power lines. This degradation will spoil

the wilderness quality of these landscapes. In addition, drilling rigs, well pad equipment, and

truck traffic will pollute the air.

7.      Plaintiffs challenge herein the Rawlins RMP, as well as actions taken by BLM

to implement the plan. BLM's decision to approve the plan, leases, and drilling permits were

the result of a flawed decision-making process. The agency failed to take the "hard look" at

the environmental impacts of its actions or consider the reasonable range of alternatives that

the National Environmental Policy Act (NEPA) requires. In addition, BLM violated the

mandates of the Federal Land Policy and Management Act (FLPMA). As a result of BLM's

unlawful actions, wilderness will be lost and air quality will get worse.

## JURISDICTION AND VENUE

8.     This court has jurisdiction over this action pursuant to NEPA, 42 U.S.C. §§

4321, *et seq.*, and its implementing regulations, FLPMA, 43 U.S.C. §§ 1702 *et seq.*, and its

implementing regulations, 28 U.S.C. § 1331 (federal question), and the Administrative

Procedure Act ("APA"), 5 U.S.C. §§ 701-06.

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because the

United States Department of the Interior and its agency, the Bureau of Land Management,

are headquartered in Washington, DC. Plaintiff Natural Resources Defense Council has an

office in Washington, DC, and Plaintiff the Wilderness Society is headquartered in

Washington, DC.

## PARTIES

10.     Plaintiff NATURAL RESOURCES DEFENSE COUNCIL (NRDC) is a non-

profit environmental membership organization with more than 400,000 members throughout

the United States. NRDC has had a longstanding and active interest in the protection of the

public lands in Wyoming. With its nationwide membership and a staff of lawyers, scientists,

and other environmental specialists, NRDC plays a leading role in a diverse range of land

and wildlife management and resource development issues. Over the years, NRDC has

participated in a number of court cases involving resource development issues throughout the

American West, including Wyoming.  NRDC brings this action on its own behalf and on behalf of its members.

11.   Plaintiff THE WILDERNESS SOCIETY (TWS) is a non-profit national leadership organization founded in 1935.  TWS works to protect America's wilderness and to develop a network of wild lands through public education, scientific analysis, and advocacy. The Wilderness Society's goal is to ensure that future generations will enjoy the clean air, water, wildlife, beauty, and opportunities for recreation and renewal that pristine deserts, mountains, forests and rivers provide.  The Wilderness Society views protecting wilderness quality and other sensitive Wyoming BLM managed lands as vital to achieving its mission. TWS has worked for years to protect BLM wilderness quality and other sensitive lands in Wyoming.  The Wilderness Society brings this action on its own behalf and on behalf of its members.

12.   Plaintiff BIODIVERSITY CONSERVATION ALLIANCE (BCA) is a non-profit conservation organization located in Laramie, Wyoming, dedicated to protecting wildlife and wildlands in Wyoming and surrounding states.  BCA has hundreds of members in Wyoming and neighboring states who have an interest in recreation on and preservation of the public lands found in Wyoming's Red Desert.  BCA brings this action on its own behalf and on behalf of its members.

13.   Plaintiff WYOMING OUTDOOR COUNCIL (WOC) is a non-profit conservation organization with over 1,000 members in Wyoming, other states, and abroad. WOC is dedicated to the protection and enhancement of Wyoming's environment, communities, and quality of life.  WOC's members live in and near the Rawlins Management Area.  WOC brings this action on its own behalf and on behalf of its members.

14.   Plaintiff WYOMING WILDERNESS ASSOCIATION (WWA) is a non-profit group dedicated to ensuring the preservation of Wyoming's naturally functioning wild land ecosystems.  In order to provide for the greatest range of values, including haven for wildlife and fish, watershed protection, pools of genetic diversity, and dispersed types of non-motorized recreation, scientific inquiry, and spiritual fulfillment, the Association is committed to the considered selection and protection of these areas.  WWA has more than one hundred members in Wyoming and neighboring states, who have an interest in recreation on and preservation of the public lands found in Wyoming's Red Desert.  WWA brings this action on its own behalf and on behalf of its members.

15.   Plaintiffs' members use and enjoy public lands in and throughout Wyoming for a variety of purposes, including scientific study, recreation, wildlife viewing, hunting, aesthetic appreciation, and financial livelihood.  These members frequently visit and recreate (*e.g.*, boating, camping, hiking, birding, sightseeing, enjoying solitude, viewing cultural resources, and engaging in scientific study) throughout the public lands governed by the Rawlins RMP, as well as the specific lands leased by BLM pursuant to the resource management plan.  Plaintiffs' members regularly visit and enjoy Wyoming's spectacular wilderness study areas, wilderness character areas, and other remarkable Red Desert areas, including Adobe Town.

16.   Plaintiffs' and their members' interests will be directly affected and irreparably harmed by the Rawlins RMP and the lease sales in the Rawlins area.  The RMP opens lands to oil and gas leasing and development and BLM has sold leases in the area for this purpose. Development activities authorized under the RMP and leases include the construction and maintenance of access roads, wells, drill pads, pipelines, waste pits, and noisy compressor

stations. Development will lead to an increase in traffic in these areas. These activities will degrade Wyoming's air quality and wilderness quality lands. This environmental degradation will adversely impact Plaintiffs' members' recreational, cultural, and scientific interests in these lands. Plaintiffs and their members are also harmed by BLM's failure to adequately address these impacts through proper NEPA analysis. Plaintiffs and their members have a substantial interest in seeing that BLM complies with these laws.

17.    Defendant KEN SALAZAR is sued in his official capacity as Secretary of the United States Department of the Interior. In that capacity, he is responsible for ensuring that agencies within the Department, including the Bureau of Land Management, comply with all applicable laws and regulations, including NEPA and FLPMA.

18.    Defendant U.S. BUREAU OF LAND MANAGEMENT is an agency within the United States Department of the Interior that is directly responsible for carrying out the Department's obligations under statutes and regulations governing mineral leasing and development, including NEPA and FLPMA. BLM manages approximately 3.4 million acres of public lands in the Rawlins, Wyoming field office.

## LEGAL FRAMEWORK

## I.    THE NATIONAL ENVIRONMENTAL POLICY ACT (NEPA)

19.    Congress enacted NEPA to, among other things, "encourage productive and enjoyable harmony between man and his environment" and to promote government efforts "that will prevent or eliminate damage to the environment." 42 U.S.C. § 4321.

20.    To fulfill this goal, NEPA requires federal agencies to prepare an environmental impact statement (EIS) for all "major Federal actions significantly affecting the environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.

21.    The agency should describe "any adverse environmental effects which cannot be avoided should the proposal be implemented." 42 U.S.C. § 4332(C)(ii).  Overall, an EIS must "provide [a] full and fair discussion of significant impacts" associated with a federal decision and "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.  An EIS must identify direct, indirect, and cumulative impacts for each reasonable alternative.  *Id.* § 1502.15.

22.    NEPA also requires consideration of "alternatives to the proposed action." 42 U.S.C. § 4332(C)(iii).  The agency must "[r]igorously explore and objectively evaluate all reasonable alternatives" and "briefly discuss the reasons" for eliminating alternatives from detailed study.  40 C.F.R. 1502.14(a).

## II.    THE FEDERAL LAND POLICY AND MANAGEMENT ACT (FLPMA)

23.    BLM manages its lands pursuant to FLPMA.  43 U.S.C. § 1701 *et seq.* FLPMA directs the Secretary of the Interior and BLM to manage public lands "under the principles of multiple use and sustained yield." 43 U.S.C. § 1732(a).  FLPMA states that public lands are to "be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use." 43 U.S.C. § 1701(a)(8).  FLPMA further requires that "[i]n managing the public lands the Secretary shall, by regulation or otherwise, take any action to prevent unnecessary or undue degradation or the lands." 43 U.S.C. § 1732(b).

24. Section 202 of FLPMA requires that BLM develop and maintain land use plans for each BLM area. 43 U.S.C. § 1712(a). BLM's land use plans, known as Resource Management Plans (RMPs), provide an orderly, public process for balancing among competing demands such as commercial exploitation, recreation, and environmental protection. 43 U.S.C. § 1712; 43 C.F.R. § 1601.0-2. RMPs provide a blueprint for how public lands are managed. Among other things, they allocate lands available for oil and gas leasing and impose conditions on that leasing, identify areas that are open, closed, or limited to motorized use, designate areas of critical environmental concern (ACECs), and recommend river segments as suitable for designation under the National Wild and Scenic Rivers Act.

25. FLPMA requires the revision of land use plans "when appropriate." 43 U.S.C. § 1702.

26. FLPMA provides for the identification and management of lands with wilderness characteristics in two distinct ways. Section 201 provides for an "inventory of all public lands and their resources and other values." 43 U.S.C. § 1711(a). Wilderness characteristics are among the "resource and other values" recognized under FLPMA and BLM has historically designated Wilderness Study Areas (WSAs) to protect them.

27. Section 603 sets a fifteen-year deadline for determining – on the basis of an inventory carried out under § 201 – which BLM lands are eligible for wilderness designation by Congress under the Wilderness Act. 43 U.S.C. § 1782(a). In addition to setting the deadline for BLM's initial § 201 wilderness inventory, § 603(a) requires BLM to issue a formal recommendation to the President concerning the suitability of these areas for

wilderness protection. Section 603(b) requires that, within two years, the President tell

Congress which lands he believes should be designated as wilderness. 43 U.S.C. § 1782(b).

28.    To safeguard Congress's prerogative to designate the wilderness-eligible lands

(WSAs) as wilderness, § 603(c) requires BLM to manage WSAs so that their wilderness

suitability is not "impaired." 43 U.S.C. § 1782(c). Shortly after FLPMA's passage, BLM

adopted an Interim Management Policy for Lands Under Wilderness Review (IMP), which

details how the agency would manage WSAs to satisfy § 603(c)'s "nonimpairment mandate."

29.    FLPMA does not limit protection of wilderness characteristics to lands

identified under Section 603 and recommended for Congressional designation under the

Wilderness Act. FLPMA's inventory process is to be "kept current so as to reflect changes

in conditions and to identify new and emerging resource and other values." 43 U.S.C. §

1711(a). As noted above, these resources and other values include wilderness characteristics.

Section 603 applies only to "roadless areas of five thousand acres or more and roadless

islands." 43 U.S.C. § 1782(a). However, BLM has also relied on its general land use

planning authority under § 202 of FLPMA to create many "WSAs" including WSAs of less

than five thousand acres. Thus, BLM lands include both "§ 603 WSAs" and "§ 202 WSAs."

Management for both WSA types is described in the IMP. Under the IMP, § 202 and § 603

WSAs are managed in nearly identical fashion.

30.    When developing RMPs, BLM is required under FLPMA to "provide for

compliance with applicable pollution control laws, including State and Federal air . . .

standards." 43 U.S.C. § 1712(c)(8). Prior to approving any land use authorization on BLM

lands, the agency must "[r]equire compliance with air . . . quality standards established

pursuant to applicable Federal or State law." 43 C.F.R. § 2920.7(b)(3).

31.    BLM prepares an EIS as part of the RMP planning process: "Approval of a resource management plan is considered a major federal action significantly affecting the quality of the human environment. The environmental analysis of alternatives and the proposed plan shall be accomplished as part of the [RMP] planning process and, wherever possible, the proposed plan and related [EIS] shall be published in a single document." 43 C.F.R. § 1610.0-6.

## III.    THE CLEAN AIR ACT (CAA)

32.    The Clean Air Act (CAA) is designed to clean up areas of unhealthy air and to prevent the degradation of clean air. 42 U.S.C. §§ 7401, 7470. Its purposes include a federal program "to protect and enhance the quality of the Nation's air resources so as to promote the health and welfare and the productive capacity of its population." *Id.* § 7401(b)(1).

33.    The U.S. Environmental Protection Agency (EPA) and the State of Wyoming have established pollution limits and controls to meet the CAA's goals. These limits include National Ambient Air Quality Standards (NAAQS) for pollutants considered harmful to public health and welfare. EPA has set NAAQS for six principal pollutants, called "criteria" pollutants, including ozone ($O_3$) and particulate matter. 40 C.F.R. Part 50. The current ozone NAAQS is set at 75 parts per billion (ppb), averaged over an 8-hour period. 73 Fed. Reg. 16436 (March 27, 2008).

34.    The State of Wyoming has yet to revise its Wyoming Ambient Air Quality Standard (WAAQS) for ozone from the prior NAAQS level of 80 ppb. Wyoming Air Quality Standards and Regulations Ch.2 § 6.

35.    Areas that do not meet the NAAQS are designated as "non-attainment" areas. 42 U.S.C. § 7502. *Id.* The State of Wyoming has requested that EPA designate an area in

the BLM Pinedale Field Office approximately sixty miles west of the Rawlins Field Office as non-attainment attainment for ozone (see ¶¶ 3-4).

36.     To ensure compliance with the NAAQS, states develop a state implementation plan (SIP), with more stringent requirements applying in non-attainment areas.

37.     In addition to providing for NAAQS, the Clean Air Act establishes requirements for the Prevention of Significant Deterioration (PSD) of air quality. 42 U.S.C. §§ 7471, 7473(a), 7476(a).

38.     The PSD program explicitly requires the protection of visibility in mandatory federal Class I areas and seeks to ensure that NAAQS in these relatively clean areas are not violated while still permitting some development. 42 U.S.C. §§ 7491, 7492. Mandatory federal Class I areas include many national parks (over 6,000 acres) and wilderness areas (over 5,000 acres). 42 U.S.C. § 7472(a). Several Class I areas are affected by emissions originating in the Rawlins management area, including the Bridger and Fitzpatrick Wilderness Areas in Wyoming, and the Rawah, Mount Zirkel, and Flat Tops Wilderness Areas in Colorado, as well as Rocky Mountain National Park, which is also in Colorado.

39.     The Clean Air Act "declares as a national goal the prevention of any future, and the remedying of any existing, impairment of visibility in mandatory Class I Federal areas which impairment results from manmade air pollution." 42 U.S.C. § 7491(a)(1). "Visibility impairment" "mean[s] any humanly perceptible change in visibility (light extinction, visual range, contrast, coloration) from that which would have existed under natural conditions." 40 C.F.R. § 51.301.

40.     Under the PSD program, pollutant emissions are limited by a "maximum allowable increase" – the PSD increment – established by EPA. 42 U.S.C. §§ 7473, 7476; 40

C.F.R. § 52.21. EPA has set increments for several pollutants including nitrogen dioxide ($NO_2$) and $PM_{10}$ – particulate matter ten microns or smaller in diameter. 40 C.F.R. § 52.21(c).

41.     Stringent increments of allowable pollution increases apply in Class I areas. Somewhat less stringent increments apply in Class II areas. In Wyoming, there are seven Class I areas, including the two wilderness areas identified above. All lands outside of Class I areas are considered Class II.

42.     The Clean Air Act imposes on "the Federal Land Manager and the Federal official charged with direct responsibility for management of such lands an affirmative responsibility to protect the air related values (including visibility) of any such lands within a Class I area." 42 U.S.C. § 7475(d)(2)(B); 40 C.F.R. § 51.166(p)(2).

## FACTS GIVING RISE TO PLAINTIFFS' CAUSES OF ACTION

## I.     RAWLINS RESOURCE MANAGEMENT PLAN

43.     The Rawlins Resource Management Plan (RMP) covers approximately 3.4 million acres of public lands and minerals in South Central Wyoming. These lands include the colorful buttes, cliffs, and canyons of the Wyoming Red Desert as well as the sagebrush habitat that is home to important wildlife species such as elk, pronghorn antelope, and sage-grouse. The Red Desert also contains wilderness quality lands, such as Adobe Town, prized for their untouched and remote beauty.

44.     BLM approved the Rawlins RMP on December 24, 2008. The Rawlins RMP replaced the Great Divide Resource Management Plan that had governed the area since 1985.

45.     The amount of oil and gas drilling in the Rawlins resource management area has dramatically expanded since 1985. The Great Divide RMP anticipated that 1,440 wells

would be drilled in the area between 1987 and 2007.  But in fact, BLM's Rawlins office has approved over 5,000 new wells since 2000, alone.  These projects include Continental Divide/Wamsutter II, Desolation Flats, and Atlantic Rim.

46.    The Rawlins RMP projects development of 8,822 additional new oil and gas wells.  It also projects construction of 3,158 miles new oil and gas roads.  Of the over 3 million acres managed by the plan, only 108,790 acres are closed to oil and gas leasing.

47.    Increased oil and gas drilling damages the wildlife, land, water, and air resources for which BLM is responsible.

**A.    Wilderness Quality Lands**

48.    Citizen groups have proposed that eight areas in the Rawlins management area be designated as WSAs and otherwise managed to protect their wilderness characteristics, including protection from oil and gas leasing.  These areas are:  Adobe Town, Bennett Mountains, Encampment River Canyon, Ferris Mountains, Kinney Rim, Pedro Mountains, Prospect Mountain and Wild Cow Creek.  The total extent of these areas within the Rawlins Field Office area is approximately 223,000 acres.  In contrast, the total acreage of land covered by the Rawlins RMP is approximately 3.4 million acres.

49.    These eight areas were not included in BLM's wilderness inventory conducted in the 1980s and were not designated as WSAs under FLPMA.  While the Rawlins management area includes some WSAs, the citizen proposed wilderness areas represent additional lands with wilderness characteristics.

50.    Although BLM has noted that some of the areas contain wilderness qualities, BLM did not conduct a re-inventory as part of the RMP process and has not elected to manage the areas to protect their wilderness characteristics.

51.     One of the seven areas, Adobe Town, has been designated "Very Rare or Uncommon" by the State of Wyoming for its scenic, geological, wildlife, botanical, and archaeological features.  Adobe Town contains magnificent sandstone formations that are over 40 million years old.  The formations are constantly changing shape, carved by the water that pools after infrequent rains.  Adobe Town also contains the remains of the first people to live in the desert.  Archeologists have found cultural sites that are 12,000 years old containing rock shelters and human remains.

52.     Part of Adobe Town is currently designated as a wilderness study area and therefore receives protection under the RMP.  The areas surrounding the WSA, often referred to as the Adobe Town "fringe areas," also contain wilderness characteristics.

53.     Plaintiffs Biodiversity Conservation Alliance, Wyoming Wilderness Association, The Wilderness Society, and Wyoming Outdoor Council requested that BLM consider a Western Heritage Alternative that would have prohibited oil and gas leasing in all of the citizen-proposed wilderness areas, including the Adobe Town expansion.

54.     BLM determined that the Western Heritage Alternative did not meet the Purpose and Need of the proposed Rawlins RMP because it required a level of protection that was inconsistent with FLPMA's multiple-use mandate.  According to BLM, the Western Heritage Alternative would impose "no surface occupancy" restrictions on 90 percent of the land in the Rawlins area.

55.     Plaintiffs Biodiversity Conservation Alliance and The Wilderness Society requested that BLM consider designation of new Wilderness Study Areas during the planning process.

64.     BLM refused to consider the designation of new Wilderness Study Areas. According to BLM, the authority to designate new WSAs ended 15 years after the enactment of FLPMA.

**B.      Air Quality**

56.     Air quality is an issue of increasing importance in Wyoming due to the expansion of oil and gas development in the state.  Many activities involved in oil and gas development, such as well construction, vehicle exhaust, drilling rigs, compressor stations, dehydrator rigs, and dehydrator gas processing operations, increase levels of nitrogen oxide and volatile organic compounds in the air.  These activities also increase emissions of carbon monoxide and particulate matter.  In addition, these activities result in the release of methane and other greenhouse gas emissions.

57.     When nitrogen oxides and volatile organic compounds combine in the presence of sunlight they form ozone.  Carbon monoxide is also involved in ozone formation chemistry.  Ozone causes a variety of human health problems such as chest pain, coughing, throat irritation, and congestion.  It can worsen many common health conditions such as asthma, emphysema, and bronchitis.  Increasing levels of ozone have been linked to increased levels of mortality.  Ozone also damages plants and ecosystems.

58.     The Environmental Protection Agency (EPA) regulates ozone under the Clean Air Act.  EPA has set a National Ambient Air Quality Standard (NAAQS) for ozone to protect public health and welfare.  42 U.S.C. § 7409(b).  This NAAQS is currently set at 75 ppb . 73 Fed. Reg. 16436 (March 27, 2008).

59.     In the Rawlins RMP final EIS, the BLM stated that the ozone NAAQS was set at 80 ppb.  While this was true in January, 2008, when the final EIS was released it was not

true in December, 2008, when the record of decision approving the Rawlins RMP was approved. EPA revised the NAAQS to 75 ppb in March, 2008. 73 Fed. Reg. 16,436 (Mar. 27, 2008). The revised standard had long been anticipated, and has been made public through Federal Register notices, yet BLM failed to consider or even acknowledge this possibility in the final EIS. The record of decision, which BLM issued after EPA revised the standard, ignored the revised standard and made no changes in the Air Quality Impact Technical Support Document.

60.    In developing the Rawlins RMP, BLM did not conduct a quantitative air quality analysis. Instead BLM prepared a "qualitative analysis." A quantitative analysis is more rigorous than a simple inventory of increased emissions, which is what BLM's qualitative analysis involved. It is also the only way to evaluate the impacts of an action on ozone levels or other pollutant levels as they relate to the concentration-based NAAQS standards.

61.    BLM attempted to excuse its failure to conduct a quantitative analysis by citing its lack of specific project-level emissions information and "time constraints in completing the analysis." BLM stated that quantitative analyses would be conducted when specific projects were defined and that demonstration of compliance with air quality standards would be required at that time.

62.    BLM referred to its qualitative analysis as an "emission comparison approach." The BLM prepared an inventory of the total amount it anticipated various criteria pollutants such as nitrogen oxides ($NO_X$), volatile organic compounds (VOC), and carbon monoxide (but not ozone) to increase over current emissions levels. It prepared no assessment or prediction of what the concentration of the various criteria pollutants would be with

implementation of the plan; it only provided an inventory of projected increased emissions amounts. It also failed to provide any analysis of whether PSD increments would be exceeded in either Class I or Class II areas.

63.   All NAAQS are expressed as concentrations of the pollutant that cannot be exceeded. NAAQS standards do not represent gross amounts of the pollutant that can be released or the quantity of pollution increase that is permissible. PSD increments are also expressed as the concentration by which criteria pollutants can permissibly increase. The legally relevant consideration when evaluating compliance with Clean Air Act air pollution standards is the concentration of the pollutant in the air; not the gross amount of the pollutant released.

64.   BLM stated in the Rawlins RMP final EIS that the concentration of ozone in the RMP area is 147 micrograms per cubic meter. This concentration converts to 74.8 ppb of ozone.[1] BLM stated that 147 $\mu g/m^3$ represented concentrations at 94 percent of the old 80 ppb ozone NAAQS. This concentration would represent 99.8 percent of the new 75 ppb NAAQS that was in place when the record of decision for the Rawlins RMP was approved.

65.   As noted, just to the west of the Rawlins Field Office, ozone levels in the Pinedale Field Office exceed the ozone NAAQS standard. These exceedences will likely lead to designation of this area by the EPA as in non-attainment with the ozone NAAQS. The Wyoming Department of Environmental Quality has determined that the primary reason for this non-attainment designation is the widespread oil and gas development in the area.

---

[1] To convert concentrations expressed in $\mu g/m3$ to ppb one divides the concentration expressed in $\mu g/m3$ by 1963 and multiplies by 1000. The constant 1963 is derived from the molecular weight of ozone and other factors in the Ideal Gas Law equation and one converts from parts per million to parts per billion by multiplying by 1000.

The Rawlins RMP final EIS acknowledged these high ozone levels in a sister Field Office, but dismissed the significance of this by stating, "to date, there is no finding of an ozone air quality standard violation at the monitoring sites in the Upper Green River Basin."

66.     In the RMP, BLM predicted that $NO_X$ emissions would increase from 3,232 tons per year (tpy) in the base year (2003) to 9,732 tpy in the long-term (2023), VOC emissions would increase from 13,755 tpy to 20,340 tpy during this time period, and carbon monoxide emissions would increase from 2,061 tpy to 9,334 tpy.  These increases would be due to the oil and gas development authorized by the RMP itself.  According to the RMP, the vast majority of these emissions will likely be generated by the drilling of coalbed methane wells or conventional natural gas wells.  Overall, BLM's inventory of emissions of all criteria pollutants predicted an increase from 20,960 tpy in 2003 to 42,305 tpy in 2023.

67.     The BLM provided no analysis of whether these increased emissions of "ozone precursors" would cause current ozone levels, which have already reached 99.8 percent of the ozone NAAQS, to exceed the NAAQS (75 ppb of ozone over an 8-hour averaging period).  BLM made no assessment of the effect of oil and gas development authorized by the RMP on future ozone concentrations in the area.  Instead, BLM elected to simply predict massive increases in ozone precursors $NO_X$, VOC, and carbon monoxide and ignore the effect of these increases on ozone concentrations.

68.     BLM also provided little analysis of the impact of increased emissions on PSD Class I or Class II increments.

69.     In the final EIS, BLM stated: "[b]ecause a quantitative relationship between the expected air emissions calculated above and the subsequent potential impacts on ambient criteria pollutant concentrations . . . or ozone are not known, it is not possible to draw any

conclusions as to potential impacts on these air quality values from any alternative." Nevertheless it asserted, that it was "unlikely" air quality standards would be exceeded or that it was not "expected" that such standards would be exceeded.

70.    BLM did not conduct any additional air quality analysis prior to selling any of the leases challenged here pursuant to the Rawlins RMP.

71.    BLM also did not conduct a quantitative analysis of air quality emissions from the Rawlins RMP before issuing the APDs challenged in this lawsuit. Some of the APDs rely on EISs prepared prior to the Rawlins RMP. These previous EISs do not provide adequate air quality analysis.

72.    Nor did BLM conduct any significant further analysis of air quality of visibility impacts prior to issuing drilling permits in the Rawlins plan area.

## II.    THE NEPA PROCESS

73.    Prior to approving the 2008 Rawlins RMP, BLM managed the land at issue herein pursuant to the 1985 Great Divide Resource Management Plan. BLM announced its intent to revise the Great Divide resource management plan on February 25, 2002.

74.    BLM opened the scoping period for the Rawlins RMP on January 31, 2003 and issued its scoping report in May 2003.

75.    BLM announced the release of the draft Rawlins resource management plan and draft environmental impact statement (DRMP/DEIS) on December 17, 2004.

76.    Plaintiffs Wyoming Outdoor Council and the Wilderness Society submitted timely comments on the DRMP/DEIS on March 17, 2005. Plaintiff Biodiversity Conservation Alliance submitted timely comments on the DRMP/DEIS on March 18, 2005.

The comments identified issues regarding sage-grouse protection, air quality analysis, climate change, and wilderness protection.

77.    The Wyoming Department of Game and Fish submitted written comments on the Rawlins DRMP/DEIS on March 11, 2005 that critiqued, among other things, the document's inadequate analysis of sage-grouse and sagebrush habitat.

78.    The Rawlins DRMP/DEIS did not consider an alternative that would maximize conservation of sagebrush habitat, as required by the 2004 National Sage-grouse Strategy. The DRMP/DEIS also relied on outdated stipulations intended to protect sage-grouse. These stipulations prohibit surface occupancy within ¼ mile of an occupied sage-grouse lek. However, numerous scientists and commenters, including the State of Wyoming, have recognized that these stipulations are inadequate to protect sage-grouse.

79.    The Rawlins DRMP/DEIS did not consider an alternative that would withdraw the Adobe Town Citizens' Proposed Wilderness Area or other citizen-proposed wilderness areas from mineral leasing. BLM refused to prohibit leasing in areas outside designated Wilderness Study Areas. BLM also refused to designate new Wilderness Study Areas.

80.    The Rawlins DRMP/DEIS also did not undertake quantitative air quality modeling for ozone and other criteria pollutants regulated under the Clean Air Act. Instead, the DRMP/DEIS used a qualitative comparison emission approach. The DRMP/DEIS acknowledged that oil and gas development would result in emissions throughout development and production and estimated that the selected alternative would result in an increase in emissions from the baseline of over 21,000 tons per year by 2023. Without quantitative air quality modeling, however, the DRMP/DEIS could not adequately evaluate effects on air quality and climate change.

81. On December 26, 2007, BLM issued its proposed Rawlins RMP and a final environmental impact statement (PRMP/FEIS). The RMP proposed to open over 3 million of the 3.4 million acres of public land covered by the plan to oil and gas development.

82. Plaintiffs, Biodiversity Conservation Alliance, Wyoming Outdoor Council, Wyoming Wilderness Association, the Wilderness Society, and Natural Resources Defense Council filed timely formal protests with the BLM Director. Among other issues, the groups protested BLM's failure to protect wilderness quality lands and BLM's failure to take a "hard look" at the air quality and climate change impacts of oil and gas development.

83. On December 24, 2008, the BLM Wyoming State Director signed the record of decision (ROD) approving the final Rawlins RMP. In signing the ROD, BLM denied the protest issues described in this complaint.

84. The approved Rawlins RMP opened citizen-proposed wilderness areas and sage-grouse core habitat for oil and gas development.

## III.    IMPLEMENTATION OF THE PLAN/LEASING AND PERMIT APPROVALS

### A.    Lease Sales

85. BLM has scheduled an oil and gas lease sale for May 11, 2010. Seven of the parcels proposed for sale affect wilderness quality lands: WY-1005-062; WY-1005-063; WY-1005-064; WY-1005-065; WY-1005-066; WY-1005-069; and WY-1005-058.

86. Five of the seven parcels (WY-1005-062; WY-1005-063; WY-1005-064; WY-1005-065; WY-1005-066) are located in the Rawlins management area and are being sold pursuant to the Rawlins RMP. These parcels affect the Kinney Rim citizen proposed wilderness area. Kinney Rim is part of the area of Wyoming referred to as Adobe Town and

is a prime destination for backpacking, wildlife viewing and exploring the pioneer history of the area.

87. One of the seven parcels (WY-1005-069) is located in BLM's Rock Springs management area within the Kinney Rim citizen proposed wilderness area. This parcel is governed by the Green River Resource Management Plan dated August 8, 1997. BLM has not completed the updated environmental analysis needed to support the sale of the Rock Springs parcel.

88. One of the seven parcels (WY-1005-058) is located in the Lander management area and affects the Fuller Peak citizen proposed wilderness area. This parcel is governed by the Lander Resource Management Plan dated June 9, 1987. BLM has not completed the updated environmental analysis needed to support the sale of the Lander parcel.

89. Since approving the Rawlins RMP, BLM has held seven lease sales. The seven lease sales were held on February 3, April 7, June 2, August 4, October 2, December 1, 2009, and February 2, 2010. BLM has also announced that it will hold a lease sale on May 11, 2010. In the seven sales already held, BLM offered 221,155 acres for sale pursuant to the challenged Rawlins RMP. Almost all of the parcels offered for sale were sold. Some of these parcels included wilderness quality lands prized for their beauty and recreational value.

90. BLM did not prepare new NEPA analyses for the lease parcels to be sold on May 11, 2010. Instead, BLM relied on the FEIS accompanying the Rawlins RMP, as well as the Green River and Lander RMPs, to satisfy the agency's NEPA obligations with respect to the lease sales. Each lease conveys to the company purchasing the lease the right to develop the parcel for oil and gas exploration and production. Development of each of the challenged parcels for oil and gas will degrade their value as wilderness quality land.

### B.    Challenged Drilling Permits

91.    In addition to oil and gas leasing pursuant to the new Rawlins RMP, BLM has also approved numerous drilling permits pursuant to the new plan. Plaintiffs challenge six of these drilling permits herein: WY-030-2009-0067-EA; WY-030-2009-0128-EA; WY-030-2009-0152-EA; WY-030-2009-0153-EA; WY-030-2009-0173-EA; WY-030-2009-0229-EA. The drilling permits are identified by their EA (Environmental Assessment) numbers.

92.    With a valid lease and drilling permit in hand, a company may immediately move forward with ground-disturbing activities. The challenged permits provide for new well pads and accompanying access roads. The well pads are approved in pristine areas valued for their scenic, recreational, and wildlife resources where little drilling has occurred to date.

93.    Permit holders have begun staking the areas for wells and roads. On one well site, the permit holder has placed a flag where drilling is to commence. Stakes are placed on several sites where roads and the well will be sited. Construction, drilling, and other industrial operations may commence at any time.

94.    BLM did not allow public comment on the NEPA analysis related to these six drilling permits.

### FIRST CAUSE OF ACTION
### (Violation of NEPA: Failure to Consider Reasonable Alternative to Protect Wilderness Characteristics)

95.    Plaintiffs incorporate herein by reference paragraphs 1-94 above.

96.    NEPA requires consideration of "alternatives to the proposed action." 42 U.S.C. § 4332(C)(iii). The agency must "[r]igorously explore and objectively evaluate all

reasonable alternatives" and "briefly discuss the reasons" for eliminating alternatives from detailed study.  40 C.F.R. 1502.14(a).

97.   BLM failed to consider the Western Heritage Alternative that provided for the withdrawal from oil and gas leasing of citizen proposed wilderness areas in the Rawlins management area.  BLM failed to withdraw land from leasing that was not already designated as a Wilderness Study Area.

98.   BLM refused to designate new Wilderness Study Areas.

99.   BLM refused to consider managing areas with wilderness qualities to meaningfully protect those qualities.

100.   BLM's failure to consider reasonable wilderness protection alternatives in the Rawlins RMP violates NEPA and is arbitrary, capricious, or otherwise not in accordance with law in violation of the APA.  5 U.S.C. § 706.

## SECOND CAUSE OF ACTION
### (Violation of NEPA:  Failure to Take a Hard Look at Environmental Impacts)

101.   Plaintiffs incorporate herein by reference paragraphs 1-100 above.

102.   NEPA and its implementing regulations require federal agencies to take a "hard look" at all of the environmental impacts of proposed actions using the best available scientific information.  42 U.S.C. § 4332; 40 C.F.R. § 1508.9.

103.   Federal agencies must consider the direct, indirect, and cumulative impacts of an action when added to other past, present, and reasonably foreseeable future actions.  *See* 40 C.F.R. §§ 1508.25(c)(3), 1508.7; 1508.8  Cumulative impacts are "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or

non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* at § 1508.7.

104.   BLM failed to take a hard look at impacts of the Rawlins RMP, lease approvals, and APDs including cumulative impacts, on wilderness characteristics, sage grouse, air quality, climate change, cultural/historic and other resources.  In addition to failing to take a hard look at the impacts of the authorized actions on climate change, BLM failed to assess how the land within the Rawlins management area would be changing in response to climate change.

105.   BLM relied entirely on the environmental analysis for the Rawlins, Green River and Lander RMPs to support the May 11, 2010 lease sale.  The environmental analysis completed for these RMPs does not include the hard look at wilderness characteristics or air quality (including climate change) that NEPA requires.  The environmental analysis also fails to include the site-specific analysis of impacts that NEPA requires.

106.   In approving the challenged APDs, BLM conducted an inadequate analysis of the effects of the actions in the EAs.

107.   BLM's failure to take a hard look at the environmental impacts of the Rawlins RMP and challenged lease sales and APD approvals violates NEPA and its implementing regulations and is arbitrary, capricious, and contrary to law in violation of the APA.  5 U.S.C. § 706.

## THIRD CAUSE OF ACTION
### (Violation of FLPMA:  Reliance on Invalid Settlement Agreement)

108.   Plaintiffs incorporate herein by reference paragraphs 1-107 above.

109.    FLPMA declares that BLM Resource Management Plans shall: "(1) use and observe the principles of multiple use and sustained yield . . . (4) rely, to the extent it is available, on the inventory of the public lands, their resources and other values; (5) consider present and potential uses of the public lands; (6) consider the relative scarcity of the values . . .; [and] (7) weigh long-term benefits to the public against short-term benefits." 43 U.S.C. § 1712(c).  In keeping with this statutory mandate, BLM has created many § 202 WSAs in which the agency applies the § 202 non-impairment standard set out in the IMP.

110.    BLM refused to consider applying the IMP's § 202 WSA non-impairment standard or its functional equivalent in the Rawlins RMP.  Contrary to FLPMA, BLM took the position in the Rawlins RMP that it could not expand WSAs or create new ones.  This position was based on a settlement agreement between the State of Utah and the Department of the Interior in September 2005.  In the Utah Wilderness Settlement, the agency agreed that it "will not establish, manage or otherwise treat public lands, other than Section 603 . . . as WSAs . . . pursuant to the Section 202 process absent congressional authorization" and that it "will refrain from applying the [Interim Management Policy or IMP] to BLM lands other than Section 603 WSAs."

111.    Because the Utah Wilderness Settlement misinterprets FLPMA, BLM's reliance on the settlement to disavow its authority to designate new WSAs and to manage its wilderness quality lands to the standards described in the IMP violates FLPMA and is arbitrary, capricious, or otherwise not in accordance with law in violation of the APA.  5 U.S.C. § 706.

## FOURTH CAUSE OF ACTION
### (Violation of FLPMA:  Failure to Comply with Air Quality Standards)

112.    Plaintiffs incorporate herein by reference paragraphs 1-111 above.

113.    When developing RMPs, BLM is required under FLPMA to "provide for compliance with applicable pollution control laws, including State and Federal air . . . standards." 43 U.S.C. § 1712(c)(8).  Prior to approving any land use authorization on BLM lands, the agency must "[r]equire compliance with air . . . quality standards established pursuant to applicable Federal or State law." 43 C.F.R. § 2920.7(b)(3).

114.    The Rawlins RMP fails to provide for compliance with applicable air quality standards.  BLM provides no underlying support for its assertion that Clean Air Act standards will be met under the RMP.  The RMP and accompanying FEIS fail to quantitatively model air pollution from oil and gas development and other activities authorized under the plan.  Moreover, BLM failed to adequately analyze the impacts of actions under the RMP combined with other reasonably foreseeable development in the region.

115.    BLM's failure to provide for compliance with relevant air quality standards prior to approving the Rawlins RMP violates FLPMA and its implementing regulations, and is arbitrary, capricious, and contrary to law in violation of the APA. 5 U.S.C. § 706.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

(1)    Declare that defendants violated NEPA and FLPMA;

(2)    Declare unlawful and set aside the Rawlins FEIS and RMP and the challenged leases and drilling permits;

28

(3)     Enjoin BLM from taking any actions pursuant to the Rawlins FEIS and RMP

– including the sale or issuance of oil and gas leases and approval of new drilling permits –

until BLM has complied with NEPA and FLPMA;

(4)     Award plaintiffs the costs they have incurred in pursuing this action, including

attorney's fees and costs, as authorized by the Equal Access to Justice Act, 28 U.S.C. §

2412(d) and any other applicable statutes; and

(5)     Grant such other and further relief as is proper.


Respectfully submitted,

Sharon Buccino (DC Bar No. 432073)
Natural Resources Defense Council
1200 New York Ave., N.W. Suite 400
Washington, D.C. 20005
(202) 289-6868

Rebecca Riley (IL Bar No. 6284356)
Natural Resources Defense Council
2 N. Riverside Plaza, Suite 2250
Chicago, IL  60606-2600
(312) 651-7913

Attorneys for Plaintiffs


Date:  May 6th, 2010